**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Judith Szurley

    v.                                  Civil No. 11-cv-089-PB

Michael J. Astrue, Commissioner
Social Security Administration


## REPORT AND RECOMMENDATION


Pursuant to 42 U.S.C. § 405(g), Judith Szurley moves to reverse the Commissioner's decision denying her application for Social Security disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423.  The Commissioner moves for an order affirming his decision.  For the reasons that follow, I recommend that the decision of the Administrative Law Judge ("ALJ") be affirmed.


### Standard of Review

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g).  However, the court "must uphold a denial of social security disability benefits unless 'the [Commissioner] has committed a legal or factual error in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts."  Irlanda Ortiz v. Sec'y of HHS, 955 F.2d at 765, 769 (1st Cir. 1991)

(citations omitted).  Moreover, the court "must uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988).  Finally, when determining whether a decision of the Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole."  Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

### Background

The parties have submitted a Joint Statement of Material Facts, document no. 10.  That statement is part of the court's record and will be summarized here, rather than repeated in full.

Szurley was laid off from her job as an administrative assistant in July of 2008 and has not engaged in substantial gainful activity since October 1, 2008.  On August 19, 2009, she applied for Social Security disability insurance benefits, alleging an onset date of October 1, 2008.  Starting in April of 2009, and up through the date of her hearing before the ALJ, Szurley worked part-time as the welfare administrator for the Town of Northumberland, New Hampshire.  At the time of her

hearing, Szurley was working between twenty and twenty-five hours per week.

In the early 1990s, Szurley had her left knee replaced. The records of medical treatment in this case consist of eleven progress notes authored by Advanced Registered Nurse Practitioner Dianne Ryan ("Nurse Ryan").  Those progress notes document assessments of hyperlipidemia[1] (five), onychomycosis[2] (seven), vertigo (one), neck pain (two), and degenerative arthritis (one).

In October of 2009, state-agency consultant Dr. Jonathan Jaffe completed a Physical Residual Functional Capacity ("RFC") assessment on Szurley.  He determined that Szurley could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk (with normal breaks) for about six hours in an eight-hour workday, sit (with normal breaks) for about six hours in an eight-hour workday, and push and/or pull with no limitations other than those on lifting and/or carrying.

---

[1] "Hyperlipidemia" is defined as "[e]levated levels of lipids in the blood plasma."  Stedman's Medical Dictionary 922 (28th ed. 2006).

[2] "Onychomycosis" is defined as a "[v]ery common fungus infection of the nails."  Stedman's, supra, at 1367.

In November of 2009, Nurse Ryan completed an RFC Questionnaire on Szurley.  Nurse Ryan identified three medical conditions: (1) osteoarthritis; (2) left knee replacement; and (3) controlled asthma.  She also identified joint pain as a symptom and opined that Szurley's prognosis was "fair," due to a limited capacity for movement without pain.

With regard to functional capacity, Nurse Ryan opined that: (1) Szurley required no assistive device to stand or walk effectively; (2) could sit for thirty minutes without needing to get up; (3) could stand for fifteen minutes before needing to sit down or walk around; (4) could sit (with normal breaks) for about four hours in an eight-hour workday; and (5) could stand/walk (with normal breaks) for about four hours in an eight-hour workday.  Finally, notwithstanding her determination that Szurley could continuously sit for thirty minutes and stand for fifteen minutes, Nurse Ryan also said that Szurley needed a job that would permit her to shift positions at will between sitting and standing or walking.

Between the time Nurse Ryan completed her RFC Questionnaire in November of 2009 and March 1, 2010, Szurley saw Nurse Ryan five times.  The first two of those visits were covered by insurance; the last three were not.

On November 24, 2009, Szurley saw Nurse Ryan for a review
of her bloodwork and medications.  The progress note indicates
that Szurley was then taking four medications, including
Darvocet N[3] and Flexeril,[4] but the note does not say why she was
taking those medications or who prescribed them.  Under history
of present illness ("HPI"), Nurse Ryan reported:

> lab f/u-c/o cutting out chol in diet, denies
> chest pain, sob, diaphoresis, h/a or dizziness, min
> walking due to knee pain, cont joint pain, diff
> standing for long periods of time, working 4hrs/d for
> 5 d—able to tol sitting for short periods of time, R
> knee giving out, toes and feet hurt, fingers stiff and
> painful at times—hx arthritis, occ numbness in hands
>   f/u fungal nails—new nail growth R great thumb.

Administrative Transcript (hereinafter "Tr.") 231.  The November
2009 office visit resulted in assessments of hyperlipidemia
(primary), onychomycosis, and degenerative arthritis.  Nurse
Ryan's treatment plan consisted of prescriptions for Lamisil[5] and
lovastatin,[6] presumably for onychomycosis and hyperlipidemia, but

---

[3] Darvocet N is an analgesic.  See Dorland's Illustrated
Medical Dictionary 12, 479, 1551 (31st ed. 2007).

[4] Flexeril is "used as a skeletal muscle relaxant for relief
of painful muscle spasms."  Dorland's, supra, at 463, 725.

[5] Lamisil is an anti-fungal medication.  See Dorland's,
supra, at 1017, 1906.

[6] Lovastatin is a medication used in the treatment of high
cholesterol.  See Dorland's, supra, at 1090.

that plan appears to include no prescriptions or other treatment
for knee pain or arthritis.

On December 28, 2009, Szurley saw Nurse Ryan for a follow-
up on her medications and complaints over weight gain.  The
December 28 progress note does not indicate that Szurley was
then taking any analgesics.  Nurse Ryan reported the following
HPI:

> f/u med-c/o end of fingernails thick and yellow—
> new nail growth, denies se meds, c/o diff losing wgt,
> snacking in evening, no exercise due to chronic knee
> pain, denies chest pain, sob, edema, visual changes,
> no diaphoresis

Tr. 233.  Nurse Ryan assessed Szurley with hyperlipidemia
(primary) and onychomycosis, and set out a treatment plan for
hyperlipidemia that included an "increase [in] exercise—
walking."  Id.  The treatment plan said nothing about knee pain.

On January 28, 2010, Szurley saw Nurse Ryan for a follow-up
on her labs and medications.  The January 28 progress note does
not indicate that Szurley was then taking any analgesics.  Nurse
Ryan reported the following HPI:

> f/u labs—hyperlipids, denies chest pain, sob,
> visual changes, occ ankles puffy, no added salt, low
> chol, low fat diet and min exercise—not walking due to
> chronic leg and back pain, no muscle pain from med,
> tol med well.

Tr. 236.  Nurse Ryan assessed Szurley with hyperlipidemia
(primary) and set out a treatment plan for hyperlipidemia that
included exercise.  The treatment plan said nothing about leg or
back pain.

On February 22, 2010, Szurley saw Nurse Ryan and complained
of pain in her neck that did not respond to Flexeril or
Darvocet.  Nurse Ryan reported the following HPI:

> 55 year old female presents with c/o pain for 2
> weeks nape of the neck, worse with movement.  c/o
> stiffness hold head still appears stiff.
> Denies: radiation of pain, fall, direct trauma,
> tingling/numbness.

Tr. 238.  Nurse Ryan assessed Szurley with neck pain (primary)
and established the following treatment plan: "suggest cervical
pillow at night otc nsaids[7] apply heat several times a day."  Tr.
239.  Nurse Ryan also recommended follow-up as necessary "if
worsening or not improving."  Id.

On March 1, 2010, Szurley saw Nurse Ryan with the following
complaint: "neck pain going up into the back of her head with
headaches and L ear hurts."  Tr. 240.  Nurse Ryan reported the
following HPI:

> c/o neck pain and L ear ache x 3 wks, headache,
> pain with head movement, L post shoulder tender, no
> n/t, using Flexeril and Ibuprofen with no effect.

---

[7] Nsaids are nonsteroidal antiinflammatory drugs.  See
Dorlands, supra, at 1312.

Tr. 240.  Nurse Ryan assessed Szurley with neck pain (primary)
and established the following treatment plan: "ice to trap x 3d
then heat, stretching, discussed use of meds and [side effects],
call office if increased symptoms."  Id.  Nurse Ryan also
scheduled a follow-up in two weeks.

The record documents no contact between Szurley and Nurse
Ryan from March 1, 2010, until September 10, 2010, one week
before Szurley's hearing before the ALJ.  On September 10, Nurse
Ryan authored a "Medical Update" on a form that asked whether
her assessment of Szurley's medical condition or functional
capacity had changed since she gave her original opinion.  Nurse
Ryan answered in the affirmative.  The form also asked Nurse
Ryan to "explain the reason for [her] changes."  Tr. 241.  In
response, Nurse Ryan reported:

> * major changes in function [and] mobility—diff
> walking, sitting, standing no greater than 5-10 mins.
>
> increasing pain in knees, feet, hands/fingers-
> walking with cane.
>
> decreased mobility–diff sitting or standing for
> more than a few mins.
>
> poor sleep due to stiffness [and] pain.
>
> occ hip (bil) pain, occ low back pain.
>
> increasing neck pain, headaches, numbness in
> fingers.

            recommended labs, arthritic panel [and] testing
      but pt refusing due to cost.

            Pt. [with] decreased mobility slow guarded gait
      [and] use of cane.

Tr. 241 (emphasis in the original).

      Nurse Ryan's "Medical Update" was not accompanied by a

progress note like the eleven she authored between April 13,

2009, and March 1, 2010.  Moreover, while the update is replete

with symptoms, it provides no diagnoses, nor does it even

indicate any particular medical condition(s) that Nurse Ryan saw

as the causes(s) of the symptoms she reported.  While the

medical update form asked Nurse Ryan to explain why she changed

her assessment of Szurley's functional capacity, the only

explanation Nurse Ryan gave was Szurley's pain, but Nurse Ryan

did not indicate the basis for her knowledge of Szurley's pain.

Thus, apart from the comments about Szurley's use of a cane and

her "slow guarded gait," which may have resulted from direct

observation, there is no evidence that Nurse Ryan's update was

based on much more than Szurley's subjective complaints.

Finally, Nurse Ryan's update says nothing about when, exactly,

Szurley's condition changed.[8]

_____

      [8] In addition to Nurse Ryan's September 10 medical update,
Szurley also solicited written statements from two of her co-

One week after Nurse Ryan wrote her medical update, Szurley
received her hearing before the ALJ.  At the hearing, Szurley
testified that: (1) on a good day, she could sit for fifteen to
twenty minutes and stand for about ten minutes; and (2) on a bad
day, she could sit for five to ten minutes and stand for about
five minutes.  She did not say how often she experienced bad
days.  Moreover, she said that her difficulties with sitting and
standing, due to knee pain, came on "overnight," Tr. 32, six to
eight months before her hearing, i.e., between mid January and
mid March of 2010.  Szurley also testified, under questioning
from the ALJ, about the physical demands of her previous and
then-current employment, her physical condition (including
pain), her medical treatment and medications (including
hydrocodone,[9] Flexeril, and Aleve), and her activities of daily

workers.  Those statements, dated September 13, describe her co-
workers' impressions of her physical condition as it related to
her ability to perform her job duties.  Perhaps because the
Commissioner found support for his denial of benefits in one of
those co-worker statements, Szurley devotes nearly three pages
of her motion to pointing out that the statements she solicited
do not even address the central issue in this case, which is her
capacity for continuous sitting and standing.

    [9] Hydrocodone is "a semisynthetic opioid analgesic derived
from codeine but having more powerful sedative and analgesic
effects."  Dorland's, supra, at 890.

living.  In addition, the hearing included the following

exchange between Szurley and the ALJ:

> Q  And let me go ahead and note, Ms. Szurley, it
> looks you did – you've, you've changed your position
> now a couple of times from sitting to standing.  Is
> this – and you're kind of leaning your hands on the
> table there.  And can you tell me right now why you
> needed to do that?
>
> A  Because I'm in a lot of pain.
>
> Q  Okay.  Well, can you tell me where you're
> experiencing the pain?
>
> A  In my knees.

Tr. 35.

In response to a hypothetical that included the limitation

"[s]it for 30 minutes at a time, stand for 15 minutes at a

time," Tr. 53, i.e., the limitation stated in Nurse Ryan's

November, 2009, RFC Questionnaire, a vocational expert ("VE")

testified that Szurley could perform her past work, as an

administrative assistant and as a hotel reservation clerk, and

could also work as an information clerk, a claims clerk, a

receptionist, and a telemarketer.  The VE went on to testify

that a person who could only sit or stand for five to ten

minutes at a time would not be able to perform those jobs.

After the hearing, the ALJ issued a decision dated October 6, 2010, that includes the following relevant findings of fact and conclusions of law:

3. The claimant has the following severe impairments: degenerative disc disease,[10] degenerative joint disease status post left knee replacement, and obesity (20 CFR 404.1520(c)).

. . . .

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

. . . .

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) involving lifting and carrying 20 pounds occasionally, and 10 pounds frequently; standing or walking for about two hours in an eight hour workday and sitting for about six hours in an eight hour workday with normal breaks; occasionally climbing stairs and ramps but never ladders; and occasionally balancing, stooping, kneeling, crouching, and crawling.

. . . .

6. The claimant is capable of performing past relevant work as an administrative assistant/clerk in manufacturing, as actually performed, and reservation clerk as actually and typically performed.  This work does not require the performance of work-related

---

[10] The court notes that there does not appear to be any mention of degenerative disc disease in the record.

activities precluded by the claimant's residual
functional capacity (20 CFR 404.1565).

. . . .

7. The claimant has not been under a disability, as
defined in the Social Security Act, from October 1,
2008, through the date of this decision (20 CFR
404.1520(f)).

Tr. 10-11, 13, 14.  In addition to determining that Szurley was

capable of performing her past relevant work, the ALJ went on to

determine, based on the testimony of the VE, that Szurley had

the RFC to perform four other sedentary jobs: information clerk,

claims clerk, receptionist, and telemarketer.

### Discussion

According to Szurley, the ALJ's decision should be reversed

or remanded because the residual functional capacity the ALJ

ascribed to her did not sufficiently reflect her need to

frequently alternate between sitting and standing.

### A. The Legal Framework

To be eligible for disability insurance benefits, a person

must: (1) be insured for such benefits; (2) not have reached

retirement age; (3) have filed an application; and (4) be under

a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  The only question

in this case is whether Szurley was disabled.

For the purpose of determining eligibility for disability insurance benefits,

> [t]he term "disability" means . . . inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  Moreover,

> [a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

When determining whether a claimant is disabled for the purpose of determining eligibility for disability insurance benefits, an ALJ is required to employ a five-step process.  See 20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe

15

> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the
> conditions for one of the "listed" impairments in the
> Social Security regulations, then the application is
> granted; 4) if the [claimant's] "residual functional
> capacity" is such that he or she can still perform
> past relevant work, then the application is denied; 5)
> if the [claimant], given his or her residual
> functional capacity, education, work experience, and
> age, is unable to do any other work, the application
> is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920, which outlines the same five-step process as

the one prescribed in 20 C.F.R. § 404.1520).

The claimant bears the burden of proving that she is

disabled. See Bowen v. Yuckert, 482 U.S. 137, 146 (1987). She

must do so by a preponderance of the evidence. See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11) (D. Mass. 1982)). Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) plaintiff's
> subjective claims of pain and disability as supported
> by the testimony of the plaintiff or other witness;
> and (3) the plaintiff's educational background, age,
> and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

B. Szurley's Argument

Szurley argues that the ALJ erred by failing to determine
that her RFC is limited by a need to alternate between sitting
and standing more frequently than would be allowed by "regular
breaks."  The ALJ committed that error, Szurley says, because
she failed to accord proper weight to Nurse Ryan's medical
update and by failing to credit her own testimony about her need
to shift positions.  The court does not agree.

As a preliminary matter, Szurley's argument rests on a
somewhat faulty premise.  Specifically, she argues that the ALJ
erred by determining that her RFC is not limited to jobs that
allow for a "sit/stand option."  While the ALJ's RFC did not
include the words "sit/stand option," or specify the amount of
time Szurley could sit or stand without changing positions, the
VE testified that all six of the jobs the ALJ said Szurley could
do can be performed by a person who can only sit for thirty
minutes at a time and stand for fifteen minutes at a time.
Thus, to the extent that having the ability to stand up after
thirty minutes of sitting and sit down after fifteen minutes of
standing constitutes a sit/stand option, the ALJ's failure to
use those words in her RFC determination is of no moment.  That
said, the dispositive question in this case is whether the ALJ

erred by declining to determine that Szurley's RFC includes a
need to change positions from sitting to standing every five to
ten minutes.

### 1. Medical Evidence

Szurley argues that the ALJ incorrectly determined her RFC
because she mishandled the medical evidence.  Her argument goes
like this: (1) notwithstanding the alleged onset date in her
application, i.e., October of 2008, and testimony at the hearing
confirming that date, she actually did not become disabled until
January of 2010, when "arthritic pain in her knees took a
significant turn for the worse and resulted in a need to change
positions between sitting and standing every 5 to 10 minutes,"
Cl.'s Mot. to Reverse (doc. no. 7), at 6; (2) the only medical-
source evidence from her actual period of disability is Nurse
Ryan's medical update from September of 2010; and (3) because
Nurse Ryan's medical update is uncontradicted by any other
medical evidence postdating the onset of her disability, the ALJ
was obligated to accept Nurse Ryan's limitations on continuous
sitting and standing and, based on that evidence, find that she
was disabled.  For his part, the Commissioner argues that the
ALJ permissibly relied on Dr. Jaffe's RFC assessment and

properly assigned relatively little weight to Nurse Ryan's update.

Szurley now says that she was not disabled until January of 2010, at the earliest.  To the extent the ALJ determined that Szurley was not disabled from October 1, 2008, until her new alleged onset date, the ALJ's decision is, necessarily affirmed. What remains, then, is the period of time between January 31, 2010,[11] and October 6, 2010.  Szurley bears the burden of proving, by a preponderance of the evidence, that she was disabled during that period.  See Bowen, 482 U.S. at 146; Mandziej, 944 F. Supp. at 129.  The medical evidence of record from that period consists of Nurse Ryan's progress notes from February 22 and March 1, 2010, along with her September 10, 2010, medical update.  In Szurley's view, the lack of any other evidence from that period, such as an RFC assessment from a state-agency consultant, makes the evidence she adduces sufficient to carry her burden of proving that she is disabled.

The court is not persuaded by Szurley's attempt to render Dr. Jaffe's 2009 RFC assessment (and Nurse Ryan's 2009 RFC Questionnaire) irrelevant by changing onset dates in the middle of the stream.  It is easy to see why Szurley wants those

----

[11] That date is drawn from Szurley's motion to reverse the Commissioner's decision.

19

assessments out of the way; the VE identified no fewer than six jobs that could be performed by a person whose RFC had the limitations delineated in the 2009 assessments. There are, however, several problems with Szurley's argument.

First of all, there is nothing in Nurse Ryan's progress notes from early 2010 that even comes close to showing the "significant turn for the worse" on which Szurley's argument is based. Rather, the record shows that Szurley continued with treatment for hyperlipidemia and presented with neck pain, but did not complain of, or seek treatment for, the knee condition she now identifies as causing her inability to sit and stand for more than five or ten minutes at a time. She reported chronic leg and back pain to Nurse Ryan on January 28, 2010, but did not complain of, or even mention, any exacerbation of those chronic conditions. On February 22, she said nothing to Nurse Ryan about her knees and back. Nurse Ryan's progress notes for both February 22 and March 1 include the notation: "Exercise: yes, walking," Tr. 238, 240. And, under the heading "General Examination," the progress notes for both January 28 and March 1 include the notation "gait normal," Tr. 236, 240. Those progress notes give absolutely no indication of a dramatic downturn in the condition of Szurley's knees in early 2010.

Moreover, even with a new onset date, the Commissioner is obligated to make his decision based on all the relevant evidence. See 20 C.F.R. § 404.1527(b). Szurley's change in condition in early 2010, were it to be adequately demonstrated, might have some effect on the weight that should be accorded to the late 2009 RFC assessments Szurley wants to walk away from. But, such a change in condition would not make those assessments irrelevant; at the very least, they would provide a baseline for evaluating the alleged deterioration in physical condition and functional capacity that Szurley now alleges. And, finally, it bears mention that Dr. Jaffe's RFC assessment is the only bona fide medical opinion in the record. See 20 C.F.R. 404.1527(a)(2) (explaining that only opinions from "acceptable medical sources" qualify as "medical opinions"). As such, it cannot be disregarded.

The court next turns to the ALJ's treatment of Nurse Ryan's medical update. All must agree that as a nurse practitioner, Nurse Ryan does not qualify as an "acceptable medical source" under 20 C.F.R. § 404.1513(a). That means that her medical update does not qualify as medical opinion under 20 C.F.R. § 404.1527(a)(2). See Social Security Ruling ("SSR") 06-03p, 71 FR 45593-03, 45594, 2006 WL 2263437 (S.S.A. 2006). Even so,

21

Nurse Ryan's medical update is subject to consideration, as evidence from an "other source," <u>see</u> 20 C.F.R. § 404.1513(d). Indeed, the Commissioner "may use information from 'other sources,' as defined in 20 C.F.R. § 404.1513(d) . . . to show the severity of an individual's impairment(s) and how it affects the individual's ability to function."  SSR 06-03p, 71 FR at 45594.  More specifically:

> Although the factors in 20 CFR 404.1527(d) . . . explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources."  These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" . . . .   These factors include:
>
> • How long the source has known and how frequently the source has seen the individual;
>
> • How consistent the opinion is with other evidence;
>
> • The degree to which the source presents relevant evidence to support an opinion;
>
> • How well the source explains the opinion;
>
> • Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
>
> • Any other factors that tend to support or refute the opinion.

71 FR at 45595.

22

Here, the ALJ acknowledged SSR 06-03p, and decided to afford Nurse Ryan's medical update minimal weight because it was "not consistent with the record as a whole." Tr. 12. That decision is supported by substantial evidence.

Plainly, the medical update is not consistent with either of the two 2009 RFC assessments. More importantly, Nurse Ryan's update is not at all consistent with the records of the treatment she provided Szurley. After Nurse Ryan completed the 2009 RFC questionnaire, she saw Szurley five times. While Szurley twice mentioned chronic knee and back pain as part of her medical history, she never presented to Nurse Ryan complaining of any condition related to her knees or back. Nurse Ryan diagnosed degenerative arthritis on November 24, 2009, but did not describe its location. None of the five progress notes from late 2009 and early 2010 mention any treatment plan for degenerative arthritis or any other knee condition. The court cannot fault the ALJ for declining to determine that Szurley was disabled by a knee condition for which she neither sought nor received treatment.

Another striking aspect of the medical record is the lack of contact between Szurley and Nurse Ryan from March 1, 2010, through September 10, 2010. That lack of contact is all the

23

more noteworthy in that the March 1 progress note called for
some sort of follow up two weeks later.  While Szurley says she
did not see Nurse Ryan because she lacked medical insurance, the
court notes that Szurley saw Nurse Ryan at least three times
after her coverage ran out, and that during those three visits,
she neither complained of or nor received treatment for the knee
condition she now says got significantly worse at exactly that
time.

     Several other SSR 06-03p factors also support the ALJ's
decision to afford minimal weight to Nurse Ryan's medical
update.  The update reports Szurley's slow guarded gait and her
use of a cane, but presents no other objective evidence, and it
offers nothing in the way of explanation other than its
references to pain.  Given the absence of an accompanying
progress note, it does not appear that the update was based on a
physical examination or any other fresh medical evidence.
Rather, it appears to be based almost entirely on Szurley's
subjective complaints, which do not gain the status of medical
evidence by virtue of being reported through a medical
professional.  See Tommasetti v. Astrue, 533 F.3d 1035, 1041
(9th Cir. 2008) ("An ALJ may reject a treating physician's
opinion if it is based 'to a large extent' on a claimant's self-

reports that have been properly discounted as incredible.")
(citing <u>Morgan v. Comm'r Soc. Sec. Admin.</u>, 169 F.3d 595, 602)
(9th Cir. 1999); <u>Fair v. Bowen</u>, 885 F.2d 597, 605 (9th Cir.
1989)); <u>Craig v. Chater</u>, 76 F.3d 585, 590 n.2 (4th Cir. 1996);
<u>Reeves v. Barnhart</u>, 263 F. Supp. 2d 154, 161 (D. Mass. 2003).

In sum, the ALJ properly accorded little weight to Nurse
Ryan's September 2010 medical update.  Having done so, she then
assessed the other evidence in the record and made an RFC
determination that is supported by substantial evidence.

## 2. Szurley's Credibility

Szurley also argues that the ALJ incorrectly determined her
RFC because she made an incorrect finding on credibility.  The
Commissioner contends that the ALJ properly assessed the
credibility of Szurley's statements about the limiting effects
of her symptoms.

According to SSR 96-7p, "an individual's statement(s) about
his or her symptoms is not in itself enough to establish the
existence of a physical or mental impairment or that the
individual is disabled."  SSR 96-7p, 1996 WL 374186, at *2.
Given the record in this case, it is difficult to see what
Szurley is relying on other than her own statements about her
symptoms.  Szurley herself has made the case for not relying on

the statements of her co-workers.  With the possible exception

of Nurse Ryan's comment about Szurley's use of a cane and her

"slow guarded gait," the September 10 medical update appears to

be little more than Nurse Ryan's transcription of Szurley's

statements about her symptoms.  With virtually no evidence in

the record other than Szurley's statements about her symptoms, a

credibility determination would seem unnecessary, given that a

claimant's statements about symptoms is insufficient to

establish disability.  See id.  But, because both parties engage

on the issue of the ALJ's credibility assessment, the court will

address that issue.

"A symptom is an individual's own description of his or her

physical or mental impairment(s)."  SSR 96-7p, 1996 WL 374186,

at *2.  When "symptoms, such as pain, fatigue, shortness of

breath, weakness, or nervousness," id., are alleged, SSR 96-7p

prescribes the following evaluation process:

> * First, the adjudicator must consider whether there
> is an underlying medically determinable physical or
> mental impairment(s) – i.e., an impairment(s) that can
> be shown by medically acceptable clinical and
> laboratory diagnostic techniques – that could
> reasonably be expected to produce the individual's
> pain or other symptoms. . . .  If there is no
> medically determinable physical or mental
> impairment(s), or if there is a medically determinable
> physical or mental impairment(s) but the impairment(s)
> could not reasonably be expected to produce the
> individual's pain or other symptoms, the symptoms

cannot be found to affect the individual's ability to do basic work activities.

* Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-78, 1996 WL 374186, at *2. In addition:

When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements. In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

> 4. The type, dosage, effectiveness, and side
> effects of any medication the individual takes or
> has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the
> individual receives or has received for relief of
> pain or other symptoms;
>
> 6. Any measures other than treatment the
> individual uses or has used to relieve pain or
> other symptoms (e.g., lying flat on his or her
> back, standing for 15 to 20 minutes every hour,
> or sleeping on a board); and
>
> 7. Any other factors concerning the individual's
> functional limitations and restrictions due to
> pain or other symptoms.

Id. at *3.  In this circuit, the seven considerations listed

above are commonly referred to as "the Avery factors."

     SSR 96-7p outlines a specific staged inquiry that consists

of the following questions, in the following order: (1) does the

claimant have an underlying impairment that could produce the

symptoms he or she claims?; (2) if so, are the claimant's

statements about his or her symptoms substantiated by objective

medical evidence?; and (3) if not, are the claimant's statements

about those symptoms credible?  See Baker v. Astrue, Civ. No.

08-11812-RGS, 2010 WL 3191452, at *8 (D. Mass. Aug. 11, 2010)

("If after evaluating the objective findings, the ALJ determines

that the claimant's reports of symptoms are significantly

greater than what could be reasonably anticipated from the

objective evidence, the ALJ must then consider other relevant information."); <u>Callie v. Comm'r of Soc. Sec.</u>, Civ. No. 09-1305, 2010 WL 1424725, at *3) (D.P.R. Apr. 6, 2010) (explaining that "before weigh[ing] the credibility of a claimant's statements about pain . . . [the] ALJ must first find a lack of support in the objective medical evidence for the allegations of pain").

Finally, an ALJ's "determination or decision must contain <u>specific reasons</u> for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186, at *2 (emphasis added).  Stated a different way, "[i]t is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' "  SSR 96-7p, 1996 WL 374186, at *2

The court begins by observing that the focus of the following credibility analysis is Szurley's statement at the hearing that pain in her knees requires her to change positions from sitting to standing every five to ten minutes.  According to the VE, if Szurley could sit for thirty minutes at a time and

stand for fifteen minutes at a time, there were at least six jobs she could do, but if her capacities for continuous sitting and standing were as limited as she said they were, then she would be unable to perform any of the six jobs on which the ALJ based her determination that Szurley was not disabled.

In her decision, the ALJ found that Szurley's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Tr. 11, but that Szurley's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the [ALJ's] residual functional capacity assessment," id.  In making that determination, the ALJ noted that "the record [was] minimal in terms of treatment for [Szurley's] degenerative knee condition."  Tr. 12.  The ALJ continued: "I have considered the claimant's allegations of pain, but given the lack of objective findings and significant treatment from her treating source, I find her allegations to be inconsistent with the medical evidence of record."  Id. (emphasis added).  The ALJ concluded her discussion of Szurley's RFC this way:

> In light of the inconsistencies between the claimant's
> allegations, and the medical evidence of record, I
> find the claimant's subjective testimony is not
> supported. . . .  The claimant's symptoms are not

supported by the medical evidence and are, therefore,
inconsistent with her alleged functional limitations.

Tr. 13.

According to Szurley, the ALJ's credibility determination
runs afoul of the decision in Guziewicz v. Astrue, No. 10-cv-
310-SM, 2011 WL 128957 (D.N.H. Jan. 14, 2011), and is also
deficient because it fails to address various relevant factors.
The court does not agree.

This case is not analogous to Guziewicz.  The ALJ in that
case found a claimant's statements about his symptoms to be "not
entirely credible," 2011 WL 12857, at *5, but, on the next page
of his decision, described the claimant as "honest and matter-
of-fact in his presentation," id. at *6.  Here, there is no such
internal inconsistency in the ALJ's decision.

Beyond that, the ALJ in Guziewicz found the claimant's
statements about disabling pain not to be credible due solely to
"a lack of objective medical evidence confirming the symptoms of
severe pain alleged by the claimant."  Id.  That was an error
because the lack of objective medical evidence is not a proper
basis for a negative credibility determination; it is the
necessary predicate for engaging in a credibility analysis in
the first place.  See id.  Here, the ALJ did note a "lack of
objective findings," Tr. at 12, but also based her decision on a

lack of treatment for the medical condition that Szurley said
was the cause of her disabling pain.  Had the ALJ not mentioned
the lack of treatment then, perhaps, she might have committed a
legal error.  But, the ALJ did not just rely on the lack of
objective findings, which makes this case materially different
from Guziewicz.

To be sure, the ALJ gave Szurley good reason to suspect a
Guziewicz-like problem with her credibility determination by
lumping the concepts of "objective medical evidence" and
"history of treatment" under the heading of "medical evidence"
and then finding Szurley not to be credible because her
statements were not supported by the medical evidence.  Without
question, the decision could have been clearer about saying why,
precisely, the ALJ did not credit Szurley's statements about her
symptoms.  Even so, it is evident that the ALJ determined both
that Szurley's statements about her symptoms were not
substantiated by objective medical evidence and that those
statements were not credible because of Szurley's demonstrated
lack of treatment for either her symptoms or their underlying
causes.  While perhaps imperfect, the ALJ's decision is
sufficient to meet the standard described in SSR 96-7p; it

explains, with sufficient specificity, the weight the ALJ gave Szurley's statements.

Szurley next argues that the ALJ committed reversible error, or at least remandable error, by failing to consider the following factors bearing on the credibility of her statements about disabling pain: (1) her own observation, at the hearing, that Szurley shifted her position from sitting to standing several times; (2) Szurley's use of pain mediation; (3) her testimony about limited activities when she went home from work; (4) her unsuccessful attempt to work thirty hours per week in June of 2010; (5) her lack of medical insurance after January of 2010; and (6) the honesty she showed by testifying that her need for a sit/stand option did not manifest until January of 2010. The Commissioner contends that because the ALJ questioned Szurley on the first, second, fourth, and fifth of those matters at the hearing, she fulfilled her duty to consider them in making her credibility determination, and further argues that the ALJ gave more consideration to Szurley's lack of insurance than Szurley gives her credit for.

While Szurley says that the ALJ erred by failing to consider the six factors listed above, it is well established, at least in the context of the Avery factors, that even absent a

written discussion, which is preferred, see Young v. Astrue, No.
10-cv-417-JL, 2011 WL 4340896, at *12 n.30 (D.N.H. Sept. 15,
2011) (citing Frustaglia v. Sec'y of Health & Human Servs., 829
F.2d 192, 195 (1st Cir. 1987)), "an ALJ may comply with Avery if
[she] explores the factors at the administrative hearing . . .
so long as there is substantial evidence in the record to
support the ALJ's conclusions," Young, 2011 WL 4340896, at *12
n.30 (citing Pires v. Astrue, 553 F. Supp. 2d 15, 24 (D. Mass.
2008); Lopes v. Barnhart, 372 F. Supp. 2d 185, 192 (D. Mass.
2005); Forni v. Barnhart, No. 05-cv-406-PB, 2006 WL 2956293, at
*10 (D.N.H. Oct. 17, 2006)).

Here, the ALJ observed that Szurley changed her position
from sitting to standing during the hearing and asked her about
it.  See Tr. 35.  The ALJ asked Szurley about her medications
and the effects those medications had on her.  See Tr. 29-30.
The ALJ asked Szurley about her attempt to increase the number
of hours she worked for the Town of Northumberland.  See Tr. 25-
26.  In addition, the ALJ asked Szurley about her activities of
daily living, see Tr. 28-29, and, in her decision, she described
evidence on that subject from Szurley's Function Report, see Tr.
at 11.  With regard to Szurley's health insurance, she testified
at the hearing that her insurance ran out at the start of 2010,

see Tr. 31, and the ALJ addressed that issue in her decision, expressly stating that she had "taken lack of insurance into consideration," Tr. 12.  That consideration consisted of the ALJ's observation that Szurley received continuing treatment from Nurse Ryan after her insurance ran out, which gave her the opportunity to have Nurse Ryan address her knee condition, see Tr. 12.  But, as the ALJ also notes, Szurley did not seek treatment for either the underlying condition or the resulting symptoms she now claims to be disabling.

To summarize, the ALJ could have addressed the Avery factors more directly in her opinion.  But, it is quite clear that the ALJ's credibility determination rested on the fact that even at the time when Szurley claims that "arthritic pain in her knees took a significant turn for the worse," a time when she saw Nurse Ryan three times for other health problems, she mentioned chronic knee pain once (on January 28, 2010), but did not seek treatment for either her pain or its underlying cause.  Therefore, there is substantial evidence in the record to support the ALJ's decision not to credit Szurley's statements about the allegedly disabling symptoms associated with her knee condition.

The court concludes by commenting on Szurley's final argument in support of her credibility, the fact that she has exhibited honesty by declining to "testify in a way that would result in a finding of disability for the entire period of her claim." Cl.'s Mot. to Reverse, at 16-17. Szurley initially applied for benefits based on an onset date of October 1, 2008. Her pre-hearing memorandum, dated one week before the hearing, alleged an onset date of October 1, 2008. See Tr. 199. At the hearing, when questioned specifically on the matter by the ALJ, Szurley's counsel confirmed that Szurley was claiming to have been disabled since October 1, 2008. See Tr. 22. Based on those three separate representations, the ALJ based her decision on the 2008 onset date. See Tr. 7. If Szurley was not disabled until January of 2010, as she now says the record shows, it is not at all clear why she alleged a 2008 onset date, and clung to that allegation right through her hearing. In that light, what Szurley's counsel now describes as evidence of honesty appears more likely to be an effort to gain yet additional advantage from the attempt to bury the 2009 RFC assessments as irrelevant by disavowing the 2008 onset date. Szurley's argument on this point is not persuasive.

**Conclusion**

As the court has explained, the ALJ could have done a better job explaining why she did not credit Szurley's statements about her symptoms, and the ALJ's decision would have benefitted from a more comprehensive discussion of the Avery factors. But, because the ALJ committed neither a legal nor a factual error in evaluating Szurley's claim, see Manso-Pizarro, 76 F.3d at 16, I recommend that: (1) Szurley's motion for an order reversing the Commissioner's decision, document no. 7, be denied; and (2) the Commissioner's motion for an order affirming his decision, document no. 9, be granted.

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice. See Fed. R. Civ. P. 72(b)(2). Failure to file objections within the specified time waives the right to appeal the district court's order. See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011) (citing United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008)); Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by objections to magistrate judge's report are subject to

37

review by district court; issues not preserved by such objection

precluded on appeal).

_____
Landya McCafferty
United States Magistrate Judge

November 23, 2011

cc:  Craig A. Jarvis, Esq.
     Robert J. Rabuck, Esq.